### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| ERIC QUAT, AARON FASSINGER, MIKE ROSS, IGOR KRAVCHENKO, MICHAEL McFADDEN and TENZIN WOISER, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ROBINHOOD FINANCIAL, LLC, a Delaware LLC, ROBINHOOD SECURITIES, LLC a Delaware LLC, ROBINHOOD MARKETS, INC., a Delaware Corporation,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiffs Eric Quat, Aaron Fassinger, Mike Ross, Igor Kravchenko, Michael McFadden and Tenzin Woiser ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

### <u>NATURE OF THE ACTION</u>

1.      This is a class action lawsuit brought against Robinhood Financial, LLC ("Robinhood Financial"), Robinhood Securities, LLC ("Robinhood Securities"), and Robinhood Markets, Inc. ("Robinhood Markets") (collectively, "Robinhood" or "Defendants") for prohibiting their customers from buying multiple publicly traded stocks, including but not limited to GameStop ("GME"), AMC Entertainment ("AMC"), American Airlines ("AAL"), Nokia ("NOK"), BlackBerry Limited ("BB"), Bed Bath & Beyond ("BBBY"), Express ("EXPR"), Koss Corporation ("KOSS"), Naked Brand Group ("NAKD"), Sundial Growers, Inc.

("SNDL"), Tootsie Roll Industries ("TR"), and Trivago NV ("TRVG") (collectively, the "Stocks"), during an unprecedented rise in valuation for the aforementioned Stocks.

2.      Robinhood is a multi-billion-dollar online brokerage firm founded in 2013. Robinhood's popularity has soared among retail investors and currently has an estimated 13 million active users.  However, none of these users were able to purchase the publicly traded Stocks on Defendant's platform during the dates in question.

3.      Defendants' actions not only deprived their customers from taking advantage of the rise of the Stocks valuation but also manipulated the free and open market, causing a substantial decrease in the Stocks valuation, all in violation of federal securities laws and state common law.

4.      Specifically, the story begins with a "short" position held on the Stocks by major hedge funds.  For example, hedge fund Melvin Capital Management held short positions on GameStop Corp. stock (ticker "GME").[1]  A "short" position is where a market participant, anticipating a certain security will decrease in value, borrows shares of the security and sells the borrowed shares at market price, with the goal of repurchasing the shares back at a later date at a lesser value, thereby pocketing the difference.

5.      However, this was no ordinary short sale, because the short interest in GME was *well over 100% of the shares of the stock that existed in the market*.  As Forbes noted:  "Indeed, Short interest for GameStop is estimated at almost 140% of its float[2]. That's extremely high. Short interest for Bed Bath and Beyond and AMC is at close to 70%. These are big numbers, typically short interest of 20% would be considered high. These stocks have massive short

---

[1] https://www.businessinsider.com/melvin-capital-lost-53-percent-january-after-gamestop-shares-skyrocketed-2021-1 (last visited 1/31/21).
[2] The term "float" refers to all the shares in existence.

interest."[3]  This means that as it relates to GME, there was a claim on more than 100% of the shares in short positions alone, let alone call options coming to fruition and daily purchases of shares.

6.      This overexposure of short sellers created a unique opportunity for other investors to effectuate a "short squeeze," wherein a competing group of investors could purchase large volumes of shares of the Stocks, causing the Stock prices to increase rapidly.  When the stock price surges upward, it causes the short investor higher and higher potential losses, and incentivizes the short seller to abandon the short position, buy back the stock, and "close" their short position.  The rapid buying to effectuate the "short squeeze" also limits supply of the outstanding stock that the short investor can buy back to cover their short positions.

7.      This is exactly what happened, albeit from an unlikely source, to wit a large group of retail investors marshalled to action through Reddit forums and other social media platforms, many of whom use Robinhood to effectuate their purchases of the Stocks.

8.      While purportedly a group of retail investors, the short squeeze strategy was a fairly sophisticated operation that had essentially three parts:  1) buy as much of the float of the Stocks as possible, 2) buy call option contracts out of the money (meaning with a strike price greater than the value of the stock at the time of purchase of the option contract) to require delivery of shares in the future in excess of available shares, and 3) continue buying shares such that the stock valuation approaches the contract price (towards being in the money).  The third step triggers a hedge from the market maker to actually buy the Stock to meet the demand.

---

[3] https://www.forbes.com/sites/simonmoore/2021/01/25/after-sky-rocketing-gamestops-short-squeeze-saga-continues-but-its-less-unusual-than-you-might-think/?sh=5ec5d6e25083 (last visited 1/31/21).

However, this step causes an increased valuation of the Stock, thereby creating a feedback loop of purchasing and rising valuation.

9.      The short squeeze was sensationally effective, causing the price of GME to soar more than 1,500% this year.[4]  Correspondingly, hedge funds that were short on GameStop recorded losses to the tune of approximately $19 billion.[5]  The other Stocks showed similar trends.

10.      This chain of events placed tremendous pressure on Robinhood, threatening its solvency with increased collateral requirements from its regulator.  In the face of this buying loop creating more and more exposure to Robinhood, to protect itself it ultimately chose to unlawfully manipulate the market to the detriment of retail investors, including Plaintiffs and Class members.  By allowing only selling of the Stocks, Robinhood was able to stop the momentum of the three steps described above, as well as allowing sold shares to replenish inventory of the Stocks.  In short, Robinhood manipulated the market to serve its personal interest at the expense of retail investors.

11.      The short squeeze put tremendous pressure on Robinhood, which was required to post increasing amounts of collateral as required by its regulator.

12.      Clearinghouses "stand between two parties in a trade to guarantee payment if either side reneges."[6]  To protect against default risk, "clearinghouses require their members —

---

[4] https://markets.businessinsider.com/news/stocks/short-sellers-sitting-on-19-billion-of-losses-on-gamestop-data-shows-2021-1-1030020684 (last visited 1/31/21).
[5] *Id.*
[6]
https://www.marketwatch.com/discover?url=https%3A%2F%2Fwww.marketwatch.com%2Famp%2Fstory%2Fpeterffy-calls-robinhood-decision-to-allow-limited-buys-of-gamestop-troubling-im-not-comfortable-11611876619&link=sfmw_tw#https://www.marketwatch.com/amp/story/peterffy-calls-

banks and brokers — to be well-capitalized, to deposit collateral and to pay into a default fund."[7] If the broker (i.e. Robinhood) cannot collect from the losers on the short side, then it "must have sufficient capital to cover losses to the clearinghouse."[8]  As such, Robinhood itself was at risk because it had to raise large amounts of money due to the volatility of the Stocks.  Both CNBC and Bloomberg News reported that Robinhood had tapped each of its credit lines.[9]

13.    Robinhood itself admits this.  In its "Under The Hood" blog, Robinhood explained:

> Clearinghouses are SEC-registered organizations that act as the central depository for securities. They keep a record of the stocks owned through a brokerage. Clearing brokerages, like Robinhood Securities, are members of clearinghouses. These clearinghouses have membership rules, approved by the SEC, that govern the activity of their members. Clearinghouses establish financial requirements for members including deposit requirements designed to reduce risk to the clearinghouse.
>
> . . .
>
> The amount required by clearinghouses to cover the settlement period of some securities rose tremendously this week. How much? To put it in perspective, this week alone, our clearinghouse-mandated deposit requirements related to equities increased ten-fold. And that's what led us to put temporary buying restrictions in place on a small number of securities that the clearinghouses had raised their deposit requirements on.
>
> It was not because we wanted to stop people from buying these stocks. We did this because the required amount we had to deposit with the clearinghouse was so large—with individual volatile securities accounting for hundreds of millions of dollars in deposit

---

robinhood-decision-to-allow-limited-buys-of-gamestop-troubling-im-not-comfortable-11611876619?mod=dist_amp_social (last visited 1/31/21).

[7] *Id.*

[8] *Id.*

[9] *Id.*; https://www.cnbc.com/2021/01/28/robinhood-will-allow-limited-buying-of-restricted-securities-friday-gamestop-jumps-after-hours.html (last visited 1/31/21); https://www.bloomberg.com/news/articles/2021-01-28/robinhood-is-said-to-draw-on-credit-lines-from-banks-amid-tumult (last visited 1/31/21).

requirements—that we had to take steps to limit buying in those volatile securities to ensure we could comfortably meet our requirements. [10]

14.     Faced with these hazards, someone had to lose, Robinhood or the ordinary retail investor.  Robinhood made the executive decision that the ordinary retail investor should lose, and unlawfully manipulated the market to restrict buying of the Stocks (allowing only selling), which benefitted Robinhood but gravely injured the retail investors who were relying on a free market to trade these Stocks.

15.     To save itself, Robinhood halted all buying of GME and the other Stocks on its platform on Thursday, January 27, 2021, and only allowed selling.  Thereafter, it heavily restricted how many shares a retail purchaser could buy.  This had the effect of substantially depreciating the value of the Stocks, causing harm to Plaintiffs and the Class.  Indeed, when Robinhood restricted further buying, and only selling, of the Stocks, GME closed down 44% from the highs earlier in the week.[11]

16.     Defendants actions are textbook market manipulation securities fraud, for which Plaintiff and the Class have a private right of action pursuant to 17 CFR § 240.10b-5.

17.     Specifically, Defendants engaged in manipulative acts by interfering with and manipulating the market as it relates to these Stocks by limiting trading of the same by disallowing any buying of the Stocks and only allowing selling.  This had the effect of depressing the share price for the Stocks by creating something of a one-way ratchet by depressing purchases while incentivizing selling.

---

[10] https://blog.robinhood.com/ (last visited 1/31/21).
[11] https://www.cnbc.com/2021/01/28/robinhood-will-allow-limited-buying-of-restricted-securities-friday-gamestop-jumps-after-hours.html (last visited 1/31/21).

18.     Plaintiffs and the Class suffered damage because the value of the Stocks plummeted as a result of Defendants' market manipulation.

19.     Plaintiffs and Class members relied on the assumption that the market was free of manipulation because prior to Defendants halting purchasing of the Stocks and only allowing selling, the Stocks were traded in a market free of manipulation.

20.     Defendants acted with scienter because they made the decision to specifically interfere in the market for their own benefit and to the detriment of Plaintiffs and Class members.

21.     Plaintiffs bring this action on behalf of themselves and the putative class against Defendants for violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 for market manipulation.

22.     Plaintiffs seek an order for relief including, but not limited to, the following: (1) requiring Defendants to pay damages and restitution to Plaintiff and the putative Class; (2) statutory damages; (3) attorneys' fees and costs; and (4) enjoining the Defendants from further legal violations of prohibiting buying options on publicly traded stocks.

## PARTIES

23.     Plaintiff Eric Quat is a California resident who lives in Studio City, California. Mr. Quat opened an account with Robinhood.  At the time that the Robinhood Defendants ceased allowing buying of the Stocks, Mr. Quat was actively invested in SNDL, NOK, and AMC. Specifically, Mr. Quat held 309 SNDL shares, 75 NOK shares, and 50 AMC shares.  As to NOK, his Robinhood application advised him that he could not purchase additional shares.  As to AMC, his Robinhood application advised him that he could not purchase additional shares or contracts.  As a result of the Robinhood Defendants' conduct in allowing only selling of his Stocks and not buying, Plaintiff Quat suffered significant losses on his investments.  Pursuant to

15 U.S.C.A. § 78u-4(a)(2)(A)(i)-(vi), Plaintiff Quat incorporates by reference the attached certification regarding his purchases of the Stocks.

24.     Plaintiff Aaron Fassinger is a Florida resident who lives in Clearwater, Florida. Mr. Fassinger opened an account with Robinhood.  At the time that the Robinhood Defendants ceased allowing buying of the Stocks, Mr. Fassinger was actively invested in NAKD, holding 149 shares.  As a result of the Robinhood Defendants' conduct in allowing only selling of his Stocks and not buying, Plaintiff Fassinger suffered significant losses on his investments. Pursuant to 15 U.S.C.A. § 78u-4(a)(2)(A)(i)-(vi), Plaintiff Fassinger incorporates by reference the attached certification regarding his purchases of the Stocks.

25.     Plaintiff Mike Ross is a Florida resident who lives in Naples, Florida.  Mr. Ross opened an account with Robinhood.  At the time that the Robinhood Defendants ceased allowing buying of the Stocks, Mr. Ross was actively invested in BBBY, holding 22 shares.  As a result of the Robinhood Defendants' conduct in allowing only selling of his Stocks and not buying, Plaintiff Ross suffered significant losses on his investments.  Pursuant to 15 U.S.C.A. § 78u-4(a)(2)(A)(i)-(vi), Plaintiff Ross incorporates by reference the attached certification regarding his purchases of the Stocks.

26.     Plaintiff Igor Kravchenko is an Illinois resident who lives in Wheeling, Illinois. At the time that the Robinhood Defendants ceased allowing buying of the Stocks, Mr. Kravchenko was actively invested in GME, holding 150 shares.  As a result of the Robinhood Defendants' conduct in allowing only selling of his Stocks and not buying, Plaintiff Kravchenko suffered significant losses on his investments.  Pursuant to 15 U.S.C.A. § 78u-4(a)(2)(A)(i)-(vi), Plaintiff Kravchenko incorporates by reference the attached certification regarding his purchases of the Stocks.

27. Plaintiff Michael McFadden is a California resident who lives in San Francisco, California. At the time that the Robinhood Defendants ceased allowing buying of the Stocks, Mr. McFadden was actively invested in AMC, holding 42.823663 shares, and SNDL, holding 100 shares. As a result of the Robinhood Defendants' conduct in allowing only selling of his Stocks and not buying, Plaintiff McFadden suffered significant losses on his investments. Pursuant to 15 U.S.C.A. § 78u-4(a)(2)(A)(i)-(vi), Plaintiff McFadden incorporates by reference the attached certification regarding his purchases of the Stocks.

28. Plaintiff Tenzin Woiser is a New York resident who lives in Brooklyn, New York. At the time that the Robinhood Defendants ceased allowing buying of the Stocks, Mr. Woiser was actively invested in NOK, holding 648 shares. As a result of the Robinhood Defendants' conduct in allowing only selling of his Stocks and not buying, Plaintiff Woiser suffered significant losses on his investments. Pursuant to 15 U.S.C.A. § 78u-4(a)(2)(A)(i)-(vi), Plaintiff Woiser incorporates by reference the attached certification regarding his purchases of the Stocks.

29. Defendant Robinhood Financial, LLC is a Delaware LLC with a principal place of business located at 85 Willow Road, City of Menlo Park, California. Defendant Robinhood Financial is a brokerage firm regulated by the Financial Industry Regulatory Authority, Inc. ("FINRA").

30. Defendant Robinhood Securities, LLC is a Delaware LLC with a principal place of business located at 85 Willow Road, City of Menlo Park, California. Defendant Robinhood Securities is a brokerage firm regulated by FINRA.

31.     Defendant Robinhood Markets, Inc. is a Delaware Corporation with a principal place of business located at 85 Willow Road, City of Menlo Park, California.  Defendant Robinhood Markets is the parent company of Robinhood Financial and Robinhood Securities.

## JURISDICTION AND VENUE

32.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, and at least one member of the proposed class is citizen of state different from Defendants.  This Court also has jurisdiction over this matter pursuant to 15 U.S.C. § 78aa.

33.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because many of the acts and transactions giving rise to this action occurred in this District, and because Defendants reside in this District.  Venue is also proper in this Court pursuant to 15 U.S.C. § 78aa.

## FACTS COMMON TO ALL CLAIMS

### *Background*

34.     Robinhood offers self-directed securities brokerage services to customers by means of its website and smartphone applications.  Defendants are Commission-registered broker-dealers and members of FINRA.

35.     Robinhood Financial acts as an introducing broker and has a clearing arrangement with Robinhood Securities.  Beginning in November 2019, Robinhood began sending all customer orders for trade execution to Robinhood Securities.  When customers open accounts with Robinhood, they enter into a customer agreement with Robinhood Financial and Robinhood Securities.

36.     Pursuant to FINRA rule 5310, broker-dealers such as Defendants owe their customers a duty of "best execution."  Best execution requires that a broker-dealer endeavor to execute customer orders on the most favorable terms reasonably available in the market under the circumstances.

37.     On or about January 11, 2021, stocks in GME, AMC, and NOK, among other, began to rise.

38.     However, on or around January 27, 2021, these Stocks were no longer available for purchase by retail investors on Defendants' platforms.  For example, on Robinhood, the Stocks featured an icon that read, "This stock is not supported on Robinhood":



39.     Defendants prohibited the purchase of the Stocks by its retail investors purposefully, knowingly, and willingly.

40.     By prohibiting the purchase of the Stocks, Defendants denied its consumers the ability to purchase shares of Stocks rapidly rising in valuation, and through its market manipulative actions caused a steep decline in the value of the Stocks.

11

41. Defendants' prohibition on purchasing the Stocks had a direct impact on lowering their valuation, resulting in losses for those consumers who already purchased the Stocks.

42. Defendants prohibited further purchasing of the Stocks in direct violation of its duty of best execution.

***Defendants Engaged In Market Manipulation***

**A. The Securities And Exchange Act of 1934**

43. The Securities And Exchange Act of 1934 states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

. . .

**(b)** To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement[] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

44. 17 C.F.R. § 240.10b-5 ("10b-5") states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

45.     One way that Rule 10b-5 can be violated is through market manipulation. *See Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 938 (9th Cir. 2009) ("Misrepresentations and most omissions fall under the prohibition of Rule 10b–5(b), whereas manipulative conduct typically constitutes 'a scheme ... to defraud' in violation of Rule 10b–5(a) or a 'course of business which operates ... as a fraud or deceit upon any person' in violation of Rule 10b–5(c)."); *Halbert v. Credit Suisse AG*, 402 F. Supp. 3d 1288, 1305 (N.D. Ala. 2019) ("Rule 10b-5 creates two types of claims under Section 10(b): misrepresentation/nondisclosure claims pursuant to Rule 10b-5(b), and scheme liability/market manipulation claims pursuant to Rule 10b-5(a) and (c).").

46.     "To plead a claim based on market manipulation, a plaintiff must allege, *inter alia,* that the defendant engaged in manipulative acts, that the plaintiff suffered damage, which was caused by his or her reliance on an assumption that the market was free of manipulation, and that the defendant acted with scienter." *In re Bank of Am. Corp.*, 2011 WL 740902, at *6 (N.D. Cal. Feb. 24, 2011).

47.     Here, Defendants engaged in market manipulation by intentionally restricting trading of the Stocks, specifically by only allowing selling of the Stocks combined with completely restricted and/or heavily restricted buying of the Stocks.

1. **Defendants Engaged In Manipulative Acts**

48.     Simply put, Defendants engaged in manipulative conduct by restricting market activity regarding the Stocks.  The Robinhood Defendants completely restricted buying of the Stocks, and only allowed selling.  Thereafter, the Robinhood Defendants continued to engage in market manipulation by heavily restricting buying, but still permitting selling of the Stocks.  Indeed, in its January 28, 2021 blog post, Robinhood stated:  "Amid this week's extraordinary

13

circumstances in the market, we made a tough decision today to temporarily limit buying for certain securities," to wit the Stocks.[12]  Robinhood further notes that "[s]tarting tomorrow [Friday, January 29, 2021], we plan to allow limited buys of these securities."[13]

49.     These tactics undertaken by Defendants were willful acts designed to deceive and/or defraud investors by controlling or artificially affecting the price of securities.

50.     Specifically, Defendants manipulative tactics caused severe losses in the value of the restricted securities, losses that would not have happened had Defendants not engaged in manipulation of the market.

51.     Defendants admitted that this market manipulation was done to protect themselves from losses at the expense of Plaintiffs and Class members.

52.     Indeed, Robinhood advertises to consumers that its mission is to "democratize finance for all."[14]  Robinhood further explains that "We believe that everyone should have access to the financial markets, so we've built Robinhood from the ground up to make investing friendly, approachable, and understandable for newcomers and experts alike."[15]

53.     But when its mission was put to the test, Robinhood folded and protected itself at the expense of its customers.

54.     Based on Robinhood's representations to Plaintiffs and Class members, and Plaintiffs' and Class members' customary practice prior to the shutdown of freely trading securities such as the Stocks on the Robinhood platform, Plaintiffs and Class members were erroneously (as we now know) lead to believe that the prices for the Stocks were driven by the

---

[12] https://blog.robinhood.com/ (last visited 2/2/21).
[13] *Id.*
[14] https://robinhood.com/us/en/support/articles/our-mission/ (last visited 2/2/21).
[15] *Id.*

natural interplay of supply and demand, not rigged by manipulators. But Defendants, despite leading Plaintiffs and Class members to believe they were operating in a free market, rigged and manipulated the market for the Stocks.

55.      Plaintiffs and Class members had no reason to believe that Defendants would so rig and manipulate the market for the Stocks until Defendants did so.

56.      In short, Defendants engaged in market manipulation by restricting and manipulating the free market for the Stocks in question, as discussed above. The manipulative acts were performed beginning on or around January 27, 2021, and, upon information and belief, continued for some time afterwards. Defendants' manipulative conduct had a clear impact in the market for the securities at issue, each fell precipitously, causing investors losses, including Plaintiffs.[16]

## 2. Defendants Acted With Scienter

57.      Defendants made false and misleading statements either intentionally or with deliberate recklessness.

58.      As set forth above, the Robinhood Defendants represented to consumers that their platform was intended to democratize finance and provide access to the financial markets. These statements ultimately proved to be false.

59.      Defendants' conduct also evidences a strong inference of scienter.

60.      Indeed, Robinhood has revealed that it acted intentionally to the detriment of investors. Robinhood's CEO, Vlad Tenev, stated publicly in an interview with Elon Musk that "as a clearing broker, and this is where Robinhood Securities comes in, we have to put up money

---

[16] https://www.cnbc.com/2021/02/01/gamestop-slide-continues-after-hours-trading.html (last visited 2/2/21).

to the NSCC [National Securities Clearing Corporation]," and that the NSCC gave Robinhood a file requesting deposit of $3 billion dollars, later lowered to $1.4 billion through negotiations, and again reduced to $700 million, which Robinhood paid.  Elon Musk then asked Mr. Tenev "[i]s anyone holding you hostage right now?"  To which Mr. Tenev answered "no."  In discussing the decision to have position closing only, Mr. Tenev said "**we knew this was a bad outcome for customers**."[17]

61.    Thus, this Court need not look beyond Robinhood's own admission regarding its state of mind to evaluate scienter.  Robinhood's own CEO stated that Robinhood elected to manipulate the market on the Stocks and acted knowing that its actions would cause a bad outcome for customers.

62.    While these statements alone raise a strong inference of scienter, a broader holistic view of the circumstances described herein create a strong inference of intentional conduct or deliberate recklessness.  This includes the heavily shorted hedge funds, some of whom were heavily involved with Robinhood, who stood to lose if trading remained open.  A holistic view establishes, at minimum, that Defendants manipulated the market to protect themselves at the expense of their customers.

63.    Any reasonable person would deem Plaintiffs' allegations of scienter as cogent and at least as compelling as any opposing inferences.

**3. Reliance**

64.    Plaintiffs and Class members specifically relied on Defendants' representations and their course of dealing with Defendants.  Specifically, Plaintiffs chose to use Robinhood

---

[17]https://www.realclearpolitics.com/video/2021/02/01/elon_musk_interviews_robinhood_ceo_vlad_tenev_on_stock_tradigin_restrictions_on_clubhouse_app.html (last visited 2/2/21).

based on the understanding that they would be able to freely trade securities, including the Stocks.  Plaintiffs' belief was informed by Robinhood's representations that it sought to democratize finance and provide them open access to the markets, as well as their course of dealing with Robinhood.

65.     Plaintiffs and the Class are also entitled to a presumption of reliance based on the "fraud-on-the-market presumption."  "The fraud-on-the-market presumption is available when the securities at issue trade on an 'efficient' market."  *In re Bank of Am. Corp.*, 2011 WL 740902, at *13.  Plaintiffs and the Class justifiably relied on a free and open market for the Stocks.  There was no reason to believe Defendants would interfere with that market.

### 4.  Loss Causation

66.     Plaintiffs and Class members directly suffered as a result of Defendants' securities fraud.

67.     It is a matter of objective fact that the prices of the Stocks fell after Defendants placed these artificial restrictions on trading for the Stocks.  Before the restrictions, the Stocks were rising in value rapidly.  There can be no reasonable dispute that Defendants' conduct caused Plaintiffs and the Class' losses.

## CLASS ALLEGATIONS

68.     Plaintiffs bring this action on behalf of themselves and as representatives of all similarly situated individuals pursuant to Fed. R. Civ. P. 23 and propose the following Class definition: All persons within the United States who purchased one or more of the Stocks through Robinhood on or before January 28, 2021 (the "Class").  Excluded from the Class are Defendants and their affiliates, parents, subsidiaries, employees, officers, agents, and directors,

as well as any judicial officers presiding over this matter and the members of their immediate families and judicial staff.

69.     Members of the Class are so numerous that their individual joinder herein is impracticable.  Robinhood has millions of active users nationwide.  By that metric alone, individual joinder of members of the Class is impracticable.  The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery, specifically through Defendants' records.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants.

70.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

        A.   Whether federal securities laws were violated by Defendants' acts as alleged herein;

        B.   Whether Defendants acted with scienter in engaging in the conduct described herein;

        C.   Whether Defendants engaged in market manipulation in restricting trading of the Stocks on their platforms; and

        D.   Whether Plaintiffs and Class members suffered damages.

71.     The claims of the named Plaintiffs are typical of the claims of the Class because the named Plaintiffs, like all other class members, held accounts with Robinhood and were subject to the same conduct and omissions by Defendants.  Plaintiffs, like all other class members, were prohibited from purchasing the Stocks on or around January 27, 2021 onward,

and were only able to sell.  There are no defenses that Defendants may have that are unique to Plaintiffs.

72.     Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class members they seek to represent, they have retained competent counsel experienced in prosecuting complex class actions, and they intend to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

73.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

74.     Plaintiffs bring all claims in this action individually and on behalf of members of the Class against Defendants.

**COUNT I**
**Violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5**
**(On Behalf Of Plaintiffs And The Class)**

75.     Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

76.     This Count is based upon Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78(j)(b), and Rule 10b-5 promulgated thereunder by the SEC.

77.     Defendants, as described at length above, engaged in illegal market manipulation in violation of federal securities law.

78.     Robinhood committed a manipulative act by restricting trading of the Stocks on its platform, as described above.  Robinhood permitted only selling of the Stocks followed by completely restricted or limited buying, and by doing so manipulated the market and negatively impacted the value of the Stocks.

79.     Defendants acted with scienter because they knew that their conduct would cause harm to Plaintiffs and Class members, and proceeded to manipulate the market regardless. Perhaps the clearest evidence of Robinhood's scienter is that its CEO publicly admitted that he and Robinhood knew that its actions would be harmful to its customers, and restricted selling of the Stocks fully aware of that fact.  Even from a holistic view of the circumstances, it is clear Defendants intentionally manipulated and interfered with the market in violation of the law, and to the detriment of Plaintiffs and members of the Nationwide Class and state subclasses.

80.     Plaintiffs specifically relied on Defendants' representations to their detriment. Plaintiffs relied on Robinhood's representations and promises that they would have free and open access to the markets, including to the Stocks.  Plaintiffs relied on their course of dealing with Defendants wherein they were able to freely trade securities, including the Stocks.

81.     Plaintiffs and the Class are entitled to a presumption of reliance based on the fraud-on-the-market presumption.  Specifically, Plaintiffs and Class members had the right to rely on a free and open market for the Stocks at issue (i.e. a market free of manipulation).

82.     Plaintiffs and members of the Class suffered damages as a direct and proximate result of Defendants' conduct, to wit a rapid and precipitous decline in the value of the Stocks directly caused by Defendants' manipulative conduct.

83.     Plaintiffs and members of the Class are entitled to damages, statutory damages, and attorneys' fees and costs of suit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendants, as follows:

(a)     For an order certifying the Class under Rule 23 and naming Plaintiffs as the representatives of the Class and Plaintiffs' attorneys as Class Counsel to represent the Class;

(b)     For an order declaring that the Defendants' conduct violates the statutes referenced herein;

(c)     For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

(d)     For compensatory and statutory damages in amounts to be determined by the Court and/or jury;

(e)     For prejudgment interest on all amounts awarded;

(f)     For injunctive relief as pleaded or as the Court may deem proper; and

(g)     For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Federal Rules of Civil Procedure 38(b), Plaintiff demands a trial by jury of all issues so triable.

Dated:  April 12, 2021                               Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: _s/ Sarah N. Westcot____
        Sarah N. Westcot

Sarah N. Westcot (FBN: 1018272)
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile:  (305) 676-9006
E-Mail: swestcot@bursor.com

**BURSOR & FISHER, P.A.**
Andrew J. Obergfell*
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: aobergfell@bursor.com

*Pro Hac Vice Application Forthcoming*